IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUELINE STEVENS,

                    Plaintiff,

        v.                                    Case No. 14 C 3305

UNITED STATES DEPARTMENT OF                   Judge Harry D. Leinenweber
HOMELAND SECURITY,
IMMIGRATION AND CUSTOMS
ENFORCEMENT,

                    Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Jacqueline Stevens requests certain records related to the detainee volunteer work program from Defendant United States Department of Homeland Security, Immigration, and Customs Enforcement ("ICE") under the Freedom of Information Act ("FOIA"). 5 U.S.C. § 552. In this action, Stevens challenges the adequacy of ICE's response to her request. The parties cross-move for summary judgment. For the reasons stated herein, Plaintiff's Motion for Summary Judgment (Dkt. No. 126) is granted in part and denied in part, and Defendant's Motion for Summary Judgment (Dkt. No. 131) is granted in part and denied in part.

## I.  BACKGROUND

Plaintiff Jacqueline Stevens is a professor of political science and director of the "Deportation Research Clinic" at

Northwestern University. (Def.'s Resp. to Pl.'s Stmt. of Facts ("PSOF") ¶ 1, Dkt. No. 132.) Defendant ICE is an executive agency principally responsible for enforcing federal immigration laws. (*Id.* ¶ 2.) On August 24, 2013, Stevens submitted the following FOIA request to ICE:

(1) ICE generated, received, or maintained requests, memoranda, and analysis used for budgeting and contractual allocations for individual private contra[c]tors and employees for Detainee Volunteer Wages, as designated, for instance, in the attached supplemental contract at p. 3 of the pdf, item 004, "funding in support of CLIN 1005, Detainee Volunteer Wages." To clarify, ICE demonstrably allocates funds to detention centers to disburse Detainee Volunteer Wages; I am requesting all underlying documentation and analysis that informs the amounts set for these allocations for each ICE detention facility. I am requesting these documents for all ICE ERO contracted facilities from January 1, 2003 to the present. This includes but is not limited to: - e-mail, faxes, notes, memoranda, reports from ICE or private companies to the ICE officials handling Immigrant and Customs Enforce[ment] budgetary decisions for Detainee Volunteer Wages. Please include as well *the underlying Houston CCA contract that includes the CLIN 1005 referenced in the supplemental contract* quoted above at p. 3 004 (and attached);

(2) All intra- inter-agency analysis of the ICE Detainee Volunteer Work Program in all media maintained by any component of ICE, including but not limited to grievances, litigation, public relations, and Congressional correspondence from January 1, 2003 to present; [and]

(3) the total amount disbursed by ICE for Detainee Volunteer Wages for each year since January 1, 2003 to the amount budgeted for 2014.

(*Id.* ¶ 3.) ICE received the request and assigned it a tracking number. (*Id.* ¶ 4.) In May 2014, Stevens filed this lawsuit to resolve outstanding issues with this request and three other FOIA requests that she submitted to ICE in 2013. (*Id.* ¶ 5; Pl.'s Resp. to Def.'s Stmt. of Facts ("DSOF") ¶ 16, Dkt. No. 139.)

Between May 2014 and June 2018, the parties engaged in efforts to streamline and manage the production of responsive records. (PSOF ¶ 6.) In June 2018, the parties agreed that ICE would conduct a supplemental search of six custodians' emails based on certain negotiated search terms. (*Id.* ¶ 7; DSOF ¶ 21.) The parties limited the search to responsive hits between 2011 and 2014. (PSOF ¶ 7.) In March 2019 and May 2019, ICE produced 707 pages of responsive documents to Stevens. (*Id.* ¶ 8.) Ninety-three pages of the supplemental production contained certain redactions based on ICE's determination that those portions contained "sensitive and/or privileged information as well as personally identifiable information." (*Id.*; PSOF ¶ 23.) Stevens objected to several of those redactions, and since May 2019, the parties have had several discussions. (DSOF ¶ 10.) During these discussions, ICE agreed to lift some § 552(b)(5) redactions that it applied to some documents in the supplemental production. (*Id.*)

Despite this progress, unresolved issues remain. Specifically, the parties cannot agree on the adequacy of ICE's

search and about the release of certain information, such as names of email recipients and senders. (*Id.* ¶¶ 12–13.) The documents at issue address: (1) ICE responses to media or congressional inquiries; (2) an editorial that ICE employees prepared in response to a New York Times article; (3) a hunger strike and administrative segregation at an ICE detention facility in Tacoma, Washington; and (4) legal advice provided on those issues. (*Id.* ¶ 28.) The parties now cross-move for summary judgment.

## II. <u>LEGAL STANDARD</u>

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When considering a motion for summary judgment, a court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, a court examines the record and draws "all reasonable inferences in the light most favorable to the party against whom the motion was filed." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019).

## III. <u>DISCUSSION</u>

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check

against corruption and to hold the governors accountable to the governed." *Rubman v. U.S. Citizenship & Immigration Servs.*, 800 F.3d 381, 386 (7th Cir. 2015) (citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). Stevens challenges the adequacy of ICE's search and ICE's withholding of information under FOIA Exemptions 5, 6, & 7(C). ICE disputes Stevens's contentions, arguing that its search was adequate and its withholding proper. The Court addresses each of Stevens's challenges below.

## A. Adequacy of the Supplemental Search

To prevail on summary judgment, "the agency must show that there is no genuine issue of material fact about the adequacy of its records search." *Rubman*, 800 F.3d at 387. Thus, the agency "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.* (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). There is a presumption of good faith that can be strengthened by evidence of the agency's efforts to satisfy the request. *Id.* The agency can support this presumption by "reasonably detailed," non-conclusory affidavits describing the agency's search. *Henson v. Dep't of Health & Human Servs.*, 892 F.3d 868, 875 (7th Cir. 2018) (stating the affidavits must "set forth the search terms used in electronic searches and the kind of search performed by the agency,

and aver that all files likely to contain responsive documents were searched").

A FOIA requester can present "'countervailing evidence' as to the adequacy of the agency's search." *Rubman*, 800 F.3d at 387 (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003)). The requester must show "that the agency might have discovered a responsive document had the agency conducted a reasonable search." *Patterson v. I.R.S.*, 56 F.3d 832, 841 (7th Cir. 1995) (citations omitted). Because "neither the requester nor the court know the content of the agency's records, this is a low bar." *Rubman*, 800 F.3d at 387. "Importantly, the question at summary judgment is not whether the agency *might* have additional, unidentified responsive documents in its possession." *Id.* "Rather the court need only determine whether the search itself was performed reasonably and in good faith." *Id.*

Stevens argues that ICE failed to offer evidence sufficient for the Court to determine the adequacy of ICE's search under Rule 56. If the Court's decision depended solely on the first declaration from Toni Fuentes, ICE's Deputy Officer, that contains a single paragraph touching on the adequacy of ICE's search, the Court would agree. (*See* Fuentes Decl. ¶ 13, PSOF Ex. 1, Dkt. No. 132-1.) There were two primary issues with this declaration: (1) a failure to show, with reasonable detail, that the search

method was reasonably calculated to uncover all relevant documents; and (2) a failure to identify the terms searched or to explain the search method. But ICE also offered a supplemental declaration from Fuentes. (Fuentes Supp. Decl., Def.'s Resp. to Pl.'s Stmt. of Add. Facts ("PSOAF"), Ex. A, Dkt. No. 141-1.) This supplemental declaration resolves both issues.

As to the first, the supplemental declaration explains ICE's general method of data collection and storage in its "Enterprise Vault journaling server, which captures and preserves all sent, deleted, and received electronic records of all ICE users" since 2008. (*Id.* ¶ 8.) *See Henson*, 892 F.3d at 875 (stating agency affidavits must "aver that all files likely to contain responsive documents were searched"). Because five of the six custodians subject to the supplemental search are no longer ICE employees, ICE directly retrieved all the records from those email accounts for January 2011 to December 2014 in "'personal storage tables' or .pst files" from the Enterprise Vault server. (Fuentes Supp. Decl. ¶ 8.) ICE then exported these files into Relativity, its e-discovery software program, and indexed, processed, and organized the files on that platform. (*Id.*) Fuentes avers that "no documents were excluded from import on the basis of being 'privileged,' 'not likely to produce relevant information,' or any other reason." (*Id.*) Therefore, ICE sufficiently established that its chosen

search method was reasonably calculated to uncover all relevant documents.

Second, the supplemental declaration identifies the terms searched and explains ICE's method of conducting that search. *See Henson*, 892 F.3d at 875 (finding that agency affidavits must provide the search terms used and describe the kind of search performed). Fuentes identifies the terms searched by reference to an exhibit—an email exchange between counsel for ICE and Stevens that includes search term negotiations and the final list of search terms. (*See* Fuentes Decl., Ex. B.) Fuentes confirms that "ICE's *Relativity* administrator thereafter utilized the exact search terms [the] parties agreed upon, with all 'modifiers,' 'restricting signals,' and 'wild cards,' if any as required by the plaintiff and agreed upon by the agency, and reflected in the above cited Exhibit B, to conduct the search of the electronic records." (Fuentes Supp. Decl. ¶ 9 (emphasis in original).) This establishes that ICE performed the agreed upon searches in the correct form and using the correct method.

ICE provided reasonably detailed declarations from Toni Fuentes that describe the search and demonstrate that it was performed reasonably and in good faith. Therefore, ICE has shown that there is no genuine issue of material fact about the search's adequacy.

## B. Improper Withholding

Stevens next challenges ICE's withholding of information pursuant to certain FOIA exemptions. "FOIA requires a federal agency upon request to disclose records in its possession, subject to nine exemptions." *Enviro Tech Int'l, Inc. v. U.S. Envtl. Prot. Agency*, 371 F.3d 370, 374 (7th Cir. 2004) (citing 5 U.S.C. §§ 552(a)-(b)). "Disclosure is required unless the requested record is clearly exempted from disclosure by the statute." *Enviro Tech*, 371 F.3d at 374. "Because disclosure is the 'dominant objective' of FOIA, courts are to construe the exemptions narrowly." *Stevens v. U.S. Immigration & Customs Enf't*, No. 17 C 2853, 2020 WL 108436, at *4 (N.D. Ill. Jan. 9, 2020) (citations omitted).

The government has the burden to prove "by a preponderance of the evidence that a withheld document falls within one of the exemptions." *Enviro Tech*, 371 F.3d at 374 (citing § 552(a)(4)(B)). Courts determine whether the government has met that burden via a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)B). To meet its burden, ICE submitted two declarations and a *Vaughn* index—a log listing and describing each document withheld, partially or in full, from the supplemental production. *Patterson*, 56 F.3d at 839 n.11.

The government is entitled to summary judgment only if its *Vaughn* index and "agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed." *Id.* at 836 (internal citations omitted). ICE withholds information from the supplemental production pursuant to Exemptions 5, 6, and 7(C). The Court addresses each asserted exemption below.

### 1. Exemption 5

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency. 5 U.S.C. § 552(b)(5). Accordingly, the agency may invoke the attorney client privilege, work product privilege, and deliberative process privilege to shield documents from disclosure. *Enviro Tech*, 371 F.3d at 374; *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (noting the provision exempts "those documents, and only those documents that are normally privileged in the civil discovery context"). Here, ICE invokes Exemption 5 to shield documents it alleges are protected by the attorney client privilege and the deliberative process privilege.

*a. Attorney client privilege*

The attorney client privilege protects communications made for the purpose of seeking or giving legal advice. *See U.S. v. White*, 970 F.2d 328, 335 (7th Cir. 1992). "The privilege is not limited to communications made in the context of litigation or even a specific dispute but extends to all situations in which an attorney's counsel is sought on a legal matter." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980). "In the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011). The question for attorney client privilege assertions "is always whether the 'primary' or 'predominant purpose' of the communication is to render or solicit legal advice." *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 176, 181 (N.D. Ill. 2018).

ICE asserts the attorney client privilege over portions of four documents that it alleges contain confidential communications between agency attorneys and other agency personnel about legal aspects of the detainee volunteer work program. (*See* PSOF ¶ 30; Fuentes Decl. ¶¶ 26–27; *Vaughn* Index at 8–9, 14–16, & 33–37 (citing Supp. 104–10, 155–63, 454–55, & 473–76), Fuentes Decl., Ex. C, Dkt. No. 132-1.) Specifically, ICE claims that agency attorneys

and agency personnel discussed: "(1) certain legal standards for inclusion in a draft agency response to the media; (2) legal advice about if and how to respond to a letter from a legal advocacy group; and (3) legal advice about an active case in litigation in which ICE was a party." (PSOF ¶ 31.)

Stevens argues the attorney client privilege does not apply to these records. Her two main points are that: (1) rendering/receiving legal advice is not the primary purpose of the withheld communications; and (2) those communications were not kept confidential. Although Stevens is correct that documents are not automatically privileged just because an attorney is a recipient or author, it is clear from ICE's *Vaughn* index descriptions that the four redactions at issue cover communications between attorney and client that seek or provide legal advice. (*See, e.g.*, *Vaughn* Index at 8-9 (Supp. 104-10) ("internal ICE discussion involving ICE's legal counsel pertaining to the legal authorities that underpin the voluntary work program"), 14-16 (Supp. 155-63) ("email exchanges among ICE ERO and OPLA pertaining to a litigation filing and litigation strategy that was being pursued in a case in which ICE was involved"), & 33-37 (Supp. 454-55 & 473-76) ("privileged information conveyed by a client (ICE ERO and Seattle's Chief Counsel) to an OPLA supervisory attorney").) *See also Vento v. I.R.S.*, 714 F. Supp. 2d

- 12 -

137, 151 (D.D.C. 2010) (finding *Vaughn* index descriptions of attorney client privileged documents sufficient for agency to withhold). Further, Stevens provides no evidence to counter ICE's insistence that the documents in question were kept confidential. (Fuentes Decl. ¶¶ 22 & 27.) Thus, ICE adequately establishes that these four records fall within the attorney client privilege and can be withheld from the supplemental production.

### b. *Deliberative process privilege*

The deliberative process privilege shields documents "reflecting the deliberative or policy-making processes of governmental agencies." *Enviro Tech*, 371 F.3d at 374. "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The purpose of the privilege is to "enhance the quality of agency decisions by protecting open and frank discussion" within the government. *Id.* (internal quotation marks and citations omitted).

To qualify for this privilege, the document must first be pre-decisional, "meaning that it must be 'generated *before* the adoption of an agency policy.'" *Nat'l Immigrant Justice Ctr. v. U.S. Dep't of Justice*, No. 19-2088, 2020 WL 1329660, at *3 (7th

Cir. Mar. 23, 2020) (citing *Tax Analysts v. I.R.S.*, 117 F.3d 607, 616 (D.C. Cir. 1997)); *see also Coastal States*, 617 F.2d at 866 (stating that "even if the document is pre[-]decisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue"). "Second the record in question must contain deliberative communications and therefore 'reflect the give-and-take of the consultative process.'" *Nat'l Immigrant Justice Ctr.*, 2020 WL 1329660, at *4; *see also Enviro Tech*, 371 F.3d at 375 (explaining that documents were deliberative because they reflected "the internal dialogue at the EPA" regarding a proposed rule).

ICE asserts the deliberative process privilege to justify most of its redactions. Indeed, all but two of the *Vaughn* index's thirty-two document entries assert this privilege. ICE argues that these redactions cover "internal drafts, discussions, deliberations, and recommendations by and among agency personnel" related to three categories of information: "(1) agency responses to media or congressional inquiries; (2) an editorial that agency employees prepared in response to a New York Times article; [and] (3) a hunger strike and administrative segregation at an ICE detention facility in Tacoma, Washington." (DSOF ¶ 28.) Stevens argues that the redactions cover facts, not deliberations, and that ICE failed to identify a "definable decisionmaking process"

to which the redacted communications could be considered pre-decisional. (Pl.'s Reply at 8, Dkt. No. 138.) The Court addresses whether and how the privilege applies to each category of documents.

Because ICE's first two categories are similar, the Court addresses them together. ICE asserts the deliberative process privilege over possible agency responses to media and congressional inquiries and an agency editorial in response to a New York Times article. Although this District and the Seventh Circuit have yet to address this exact topic, other courts have confronted similar "messaging communications." *See, e.g.*, *New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (JMF), 2018 WL 4853891, at *2 (S.D.N.Y. Oct. 5, 2018) (ordering disclosure of draft responses to Congress and the *Washington Post*); *Am. Civil Liberties Union of Mass., Inc. v. U.S. Immigration & Customs Enf't*, No. CV 19-10690-LTS, 2020 WL 1429882, at *6-7 (D. Mass. Mar. 24, 2020) (ordering disclosure of draft talking points, email communications, and a draft agenda). These cases conclude "that 'messaging' communications *can* be protected by the deliberative process privilege," but not "*all* deliberations over what to say are protected." *New York*, 2018 WL 4853891, at *2. Given that agencies are in constant communication with the press, public, and Congress, the privilege has limits.

Accordingly, messaging communications are protected if they "reflect[ ] the give-and-take of the consultative process" and were "prepared to facilitate and inform a final decision or deliberative function entrusted to the agency." *Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 559–60 (1st Cir. 1992). For example, deliberations "about the timing and content of a policy announcement, although post-decisional with respect to the particular policy to be announced, also relate to a future decision (what to say and when to say it) that implicates questions within the scope of the agency's delegated policymaking authority." *Id.; see also Am. Ctr. for Law and Justice v. U.S. Dep't of Justice*, 325 F. Supp. 3d 162, 172 (D.D.C. 2018) (applying privilege to parts of emails discussing response to media inquiries about a meeting that was the subject of a DOJ investigation); *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 207–08 (D.D.C. 2010) (applying privilege to communications regarding agency's response to congressional and press inquiries related to specific investigations and prosecutions). Messaging communications are not protected where the "communications amount to little more than deliberations over how to spin a prior decision, or merely reflect an effort to ensure that an agency's statement is consistent with a prior decision." *New York*, 2018 WL 4853891, at *2.

Therefore, the key question is:

> whether the disputed materials reflect deliberations about what message should be delivered to the public about an *already-decided* policy decision, or whether the communications are of a nature that they would reveal the deliberative process underlying a *not-yet-finalized* policy decision, including the very decision about what message to deliver—provided that the particular messaging decision is among those that Congress has asked the agency to make.

*Id.* (internal quotations and citations omitted). Applying that standard to the documents here, ICE's internal communications about its responses to outside inquiries from the press, Congress, advocacy groups, and the public are not protected by the deliberative process privilege. From the *Vaughn* index descriptions and a review of the reprocessed supplemental production, ICE merely deliberates over which agency subpart should handle an inquiry and/or how to spin its prior decisions about the detainee volunteer work program and general operation of ICE detention centers. Those communications do not qualify as facilitating/informing a final agency decision or performing a deliberative function specifically assigned to ICE.

ICE emphasizes that many of the documents contain draft responses, meaning they are inherently not-yet-finalized and, therefore, entitled to protection. But the fact that a document itself might not be finalized (is labeled as a draft, has redlines, or contains comments) does not "automatically exempt it from

- 17 -

disclosure." *See New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007) (ordering disclosure of draft documents). This distracts from a central piece of the deliberative process privilege analysis: How the document relates to the agency's statutory purpose and decisionmaking process. ICE must show that the messaging communications are so "intimately bound up with [the] agency's central policy mission" to warrant protection. *New York*, 2018 WL 4853891, at *2. ICE does not make that showing here.

ICE does not exercise its essential policymaking role when it coordinates who from the agency should respond to an outside inquiry and what they should say consistent with and in defense of existing agency policies. In fact, ICE's document descriptions show no evidence of policymaking. *See, e.g.*, *Vaughn* Index at the following:

- Page 2: Supp. 21 ("describing a news media inquiry to ICE regarding an ICE contract with a county jail . . . contains both a background to the inquiry as well as a draft proposed response to the media");

- Page 7: Supp. 87-89 ("Mr. Homan expresses his thoughts on what the agency should consider when editing the draft submitted by the journalist . . . Ms. Christensen is expressing her thoughts regarding options on what ICE's contribution to the draft provided by the journalist should look like . . .");

- Page 25: Supp. 298-300 ("exchange of opinions . . . regarding the best way to respond to the Congressional inquiries, ERO Seattle field office's opinion and

recommendation regarding which ERO sub-offices are best equipped to answer the questions and their opinion on which ICE office should engage with the local advocacy group");

- Page 37: Supp. 483–89 ("opinion expressed by ICE ERO employee to the employee's superiors regarding how the agency should approach answering an inquiry on behalf of Congressman Adam Smith regarding ICE's detention facility, as well as the employee's proposed draft response");

- Page 40: Supp. 500–01 ("This draft letter is withheld in full under Exemption (b)(5) as it contains red-lined tracked changes and comments bubbles by ICE ERO with suggested language and edits and the reasons therefor [sic], comments, questions, clarifications, and requests for additional information"); and

- Page 41: Supp. 549 ("internal email discussion among ICE ERO and OPA employees regarding a draft press release in response to a media inquiry pertaining to the use of the volunteer work program at certain county jails that house ICE detainees").

Indeed, ICE admits that every federal agency confronts this same task. (*See* Def.'s Reply at 6, Dkt. No. 140 ("one of ICE's other functions (as is the case with all other federal agencies) is to communicate with, and be accountable to, Congress and the public about agency affairs and operations . . .").) The duty to respond is not unique to ICE.

ICE's *Vaughn* index descriptions and accompanying declarations do not demonstrate that these communications relate to anything other than rationalizing the agency's final decisions. Thus, disclosure would not reveal the deliberative process behind not-

yet-finalized policy decisions. Some of the redacted portions also appear to be pure facts and data that ICE solicited from its private jail operators. This kind of information is not protected by the deliberative process privilege. *Nat'l Immigrant Justice Ctr. v. U.S. Dep't of Justice*, No. 12-CV-04691, 2018 WL 1508531, at *5 (N.D. Ill. Mar. 27, 2018) (citing *Enviro Tech*, 371 F.3d at 374) (noting the deliberative process privilege "typically does not justify the withholding of purely factual material"). Therefore, ICE must disclose any non-attorney client privileged messaging communications on the following pages of the supplemental production: 21, 31–33, 46, 87–89, 104–10, 136–38, 149, 155–63, 199–204, 229–30, 238, 259, 290–96, 298–300, 337–38, 343, 348, 372, 483–89, 494–96, 498–500, 500–01, 506–08, 549, 552–55, 611.

ICE also asserts the deliberative process privilege over a third broad category of communications related to a detainee hunger strike and administrative segregation in a Washington facility. The Court identifies these remaining communications as Supp. 142–46, 428–29, 454–55, 473–76. As an initial matter, there are two documents in this group that contain ICE discussion about a response letter to the American Civil Liberties Union. (*Vaughn Index* at 33–37 (citing Supp. 454–55 and 473–76).) As with

categories one and two, these kinds of discussions are considered "messaging communications." *See New York*, 2018 WL 4853891, at *2.

The *Vaughn* index descriptions that address the "messaging communications" portions of these two documents signal circumstances where ICE again rationalizes a finalized policy. (*Vaughn* Index at 33–35 (citing Supp. 454–55) (describing redactions in emails about detainees in administrative segregation at Tacoma Detention Center: "internal email discussion . . . regarding whether and how to respond to a letter by the American Civil Liberties Union (ACLU) regarding detainees at one of ICE's detention facilities") & 35–37 (citing Supp. 473–76) (same).) This description merely reflects "deliberations about what 'message' should be delivered to the public about an *already-decided* policy decision"—what ICE should tell the ACLU about its administrative segregation policy as applied to detainees as the Tacoma Detention Center. *New York*, 2018 WL 4853891, at *3. Disclosure would not reveal the deliberative process behind a not-yet-finalized policy decision. Therefore, ICE shall disclose any non-attorney client privileged messaging communications redacted on Supp. 454–55 and 473–76.

The remaining parts of documents that ICE asserts the deliberative process privilege over are: (1) a draft summary report regarding ICE's tracking process for detainees on hunger strike

(Supp. 142–46); (2) a draft to-do list created in response to concerns voiced "by external stakeholders during a round table pertaining to an ICE detention facility" (Supp. 428–29); and 3) an email discussion about ways to maintain detainee safety within a detention facility during an ongoing hunger strike (Supp. 473–76). (*Vaughn* Index at 11–13, 31–32, & 35–37.) As to the first, ICE describes the report as containing employee "thoughts and ideas" about "how best to keep track of detainees on hunger strike and to ensure the detainees' well-being." (*Id.* at 12.) ICE also indicates that its final process "for better tracking the detainees engaging in a large-scale hunger strike at this particular facility was still evolving at that time." (*Id.*) Therefore, the summary report is predecisional and deliberative. It qualifies for protection under the deliberative process privilege.

As to the to-do list, ICE indicates that it contains "opinions in terms of what can be done to resolve the concerns and which operational component should take the lead." (*Id.* at 32.) "The page consists of red-line edits and yellow highlights, reflecting the document is still a work in progress." (*Id.*) The to-do list contains opinions and discussions related to what can and should be done about the individual stakeholder concerns and who should do it, meaning it is deliberative and predecisional. Accordingly, it is protected by the deliberative process privilege.

Third, an email exchange with messaging communications, discussed above, also contains an internal discussion where employees request that superiors "approve a specific course of action to ensure safety within the detention facility" during an ongoing hunger strike. (*Id.* at 36.) The email does not contain final approval of the proposed course of action. (*Id.*) As deliberative and predecisional, these portions of the communication are covered by the deliberative process privilege. However, they will need to be segregated from the messaging communications portions previously ordered for disclosure. Thus, all three communications are protected by the deliberative process privilege.

### 2. *Exemptions 6 & 7(C)*

ICE redacted names and other personal identifiers from the supplemental production pursuant to Exemptions 6 and 7(C). During negotiations, ICE agreed to disclose the names of certain federal employees that it had previously redacted. Now, Stevens challenges the remaining name redactions. Stevens does not challenge ICE's redaction of email addresses, phone numbers, and third-party information under Exemptions 6 and 7(C). (*See* Pl.'s Reply at 10 ("The only redactions challenged here are the names appearing on the 'to' and 'from' line of the email correspondence.").) Therefore, the Court analyzes only whether Exemptions 6 and 7(C)

apply to ICE's redaction of federal employee names from the emails in the supplemental production.

Exemption 7(C) protects, "records or information compiled for law enforcement purposes" if release "could reasonably be expected to constitute an unwarranted invasion of personal privacy," whereas Exemption 6 shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(6) & (b)(7)(C). "Exemption 7(C) is more protective of privacy than Exemption 6: The former provision applies to any disclosure that 'could reasonably be expected to constitute' an invasion of privacy that is 'unwarranted,' while the latter bars any disclosure that 'would constitute' an invasion of privacy that is 'clearly unwarranted.'" *U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 496 n.6 (1994).

Thus, the threshold inquiry is whether the documents constitute the kinds of records that Exemptions 6 & 7(C) are meant to protect. Exemption 6 protects medical files, personnel files, and other "similar files." 5 U.S.C. § 552(b)(6). The term "similar files" is interpreted broadly to include any "detailed Government records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982). The question as to "similar files" is whether

the records at issue are likely to contain the type of personal information that would be in a medical or personnel file. *Id.* at 601. Such information generally includes "place of birth, date of birth, date of marriage, employment history" and other "identifying information," though not necessarily "intimate" information. *Id.*

The names redacted here are not akin to personnel or medical files. The emails at issue are mostly "mundane interoffice communications that do not contain any detailed personal information." *Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287, 301 (S.D.N.Y. 2011). Indeed, many of these "emails include standard signature lines with the sender's name, position, department, and phone number. Some of the emails include the email addresses of senders or recipients of the messages; some do not." *Id.* Such communications are not like personnel or medical files.

ICE itself distinguishes between "personnel record files" and the emails at issue here. (Def.'s Reply at 8.) Yet, ICE argues that the names it redacted are protected because they belong to lower level employees. ICE labels these employees as "support staff." (*Id.*) Generally, support staff provide administrative assistance to agency managers and would not have job titles like "Deputy Chief," "Chief of Staff," "Deputy Field Office Director,"

or "Senior Advisor." (Reprocessed Prod. at Supp. 105, 109, 138, & 299, Fuentes Decl., Ex. D, Dkt. No. 132-1.) Such titles indicate some level of managerial authority. Even if such employees were support staff, ICE overstates the authority supporting these redactions and fails to cite any case binding on this Court or directly relevant to these circumstances. *See, e.g.*, *Skinner v. U.S. Dep't of Justice*, 744 F. Supp. 2d 185 (D.D.C. 2010) (upholding redaction of law enforcement and support staff names, among others, from documents related to specific investigations under Exemption 7(C)); *Associated Press v. U.S. Dep't of Justice*, 549 F.3d 62 (2d Cir. 2008) (withholding name redactions from a commutation petition under Exemptions 6 & 7(C)). Thus, Exemption 6 does not permit ICE to withhold the redacted federal employee names.

As for Exemption 7(C), the Court asks whether these emails were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(C). While ICE is obviously a federal law enforcement agency, not every document ICE produces or amasses has been "compiled for law enforcement purposes." *Id.* "Courts have generally interpreted Exemption 7 as applying to records that pertain to specific investigations conducted by agencies, whether internal or external, and whether created or collected by the agency—in other words, investigatory files." *Families for Freedom*

*v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 397 (S.D.N.Y. 2011) (collecting cases interpreting Exemption 7). The documents at issue are not investigatory files.

First, ICE argues broadly, stating that these emails and attachments involve "the performance of ICE's law enforcement mission." (Def.'s Reply at 8.) Yet, under this definition, any email or document ICE creates or exchanges qualifies for the privilege. Exemption 7(C) is not so all-encompassing. Next, ICE pivots a few degrees, asserting that it compiled these emails and attachments for the purpose of detaining "individuals who are in the United States illegally." (*Id.* at 9.) This is no less broad than ICE's first point and merely repeats one of ICE's general functions. Neither proffered purpose links the documents to a specific investigation. Instead, the documents relate to "the general execution of tasks by agency personnel." *Families for Freedom*, 797 F. Supp. 2d at 397. While the topics addressed in the documents pertain to law enforcement in a general sense, the documents are not investigatory. Thus, they were not "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(C). ICE must disclose the redacted names of the other federal employees on the emails.

### *3. Segregation of Non-Exempt Information*

Finally, Stevens argues that ICE failed to segregate and release non-exempt information, like facts, from the supplemental production. FOIA requires that "[a]ny reasonably segregable portion of a record . . . be provided to any person requesting such record after deletion of the portions which are exempt." *Id.* § 552(b). "[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). However, an agency is not required to segregate non-exempt material if "the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." *Pub. Emps. for Envtl. Responsibility v. Envtl. Prot. Agency*, 213 F. Supp. 3d 1, 24 (D.D.C. 2016) (citations omitted). Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable materials. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). Nonetheless, the Court must make an express finding on the issue of segregability. *Patterson*, 56 F.3d at 840.

An agency's *Vaughn* index plays a key role in a court's segregability analysis. *See, e.g.*, *Loving v. U.S. Dep't of Defense*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of

the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination"); *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 778 (D.C. Cir. 2002) (upholding agency's segregation efforts based on "comprehensive *Vaughn* index" and "the affidavits of [agency officials]").

ICE's *Vaughn* index is sufficiently descriptive and comprehensive. It addresses each document and provides specific explanations—albeit some ultimately rejected as improper—for each redaction. In a declaration, ICE avers that it conducted a "line-by-line" review of each responsive document. (Fuentes Decl. ¶¶ 14 & 40-42.) ICE also declares "that all information not exempted from disclosure by FOIA . . . was correctly segregated where possible and released to Stevens." (*Id.* ¶ 42.) ICE indicates that factual information was so intertwined with privileged information that it could not be segregated in just one instance. (*Vaughn* Index at 35-36 (discussing Supp. 483-89).) ICE's *Vaughn* index and declaration, considered together, support a finding that ICE released all segregable information.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (Dkt. No. 126) is granted in part and denied in part, and Defendant's Motion for Summary Judgment (Dkt. No. 131) is granted

in part and denied in part. ICE is ordered to disclose non-attorney client privileged messaging information redacted pursuant to Exemption 5 on the following pages of the supplemental production: 21, 31-33, 46, 87-89, 104-10, 136-38, 149, 155-63, 199-204, 229-30, 238, 259, 290-96, 298-300, 337-38, 343, 348, 372, 454-55, 473-76, 483-89, 494-96, 498-500, 500-01, 506-08, 549, 552-55, 611. ICE is further ordered to disclose the remaining names of federal employees redacted pursuant to Exemptions 6 & 7(C).

**IT IS SO ORDERED.**

_____
  Harry D. Leinenweber, Judge
  United States District Court

Dated: 4/8/2020